## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Ashley Salas, individually and on behalf of all others similarly situated, | ) ) |
| | ) **Case No.:** |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **CLASS ACTION** |
| Acuity-CHS, LLC d/b/a Comprehensive Health Services, LLC, | ) |
| | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

## CLASS ACTION COMPLAINT

Plaintiff Ashley Salas ("Plaintiff"), individually and on behalf of all others similarly situated, through the undersigned counsel, hereby alleges the following against Defendant Acuity-CHS, LLC d/b/a Comprehensive Health Services, LLC ("CHS" or "Defendant").

## NATURE OF THE ACTION

1.      This is a class action for damages with respect to Comprehensive Health Services, LLC, for its failure to exercise reasonable care in securing and safeguarding its patients' sensitive personal and health data—including names, dates of birth, and Social Security numbers (collectively referred to herein as "Private Information").

2.      This class action is brought on behalf of patients whose sensitive Private Information was stolen by cybercriminals in a cyber-attack that accessed sensitive patient information through CHS's services on or around September 30, 2020 (the "Data Breach" or "Breach").

3.      The Data Breach affected at least 106,752 individuals from CHS's services.

4.      CHS reported to Plaintiff that information compromised in the Data Breach included her Private Information.

5.      Plaintiff was not notified until February of 2022, nearly 17 months after her information was first accessed.

6.      As a result of the Data Breach, Plaintiff and other members of the Class (defined below) will experience various types of misuse of their Private Information in the coming years, including but not limited to unauthorized credit card charges, unauthorized access to email accounts, and other fraudulent use of their financial accounts.

7.      Defendant's security failures enabled the hackers to steal the Private Information of Plaintiff and other members of the Class.  These failures put Plaintiff's and other Class members' Private Information at a serious, immediate, and ongoing risk.  Additionally, Defendant's failures caused costs and expenses associated with the time spent and the loss of productivity from taking time to

address and attempt to ameliorate the release of personal data, as well as emotional grief associated with constant monitoring of personal banking and credit accounts. Mitigating and dealing with the actual and future consequences of the Data Breach has also created a number of future consequences for Plaintiff and Class members—including, as appropriate, reviewing records of fraudulent charges for services billed but not received, purchasing credit monitoring and identity theft protection services, the imposition of withdrawal and purchase limits on compromised accounts, initiating and monitoring credit freezes, the loss of property value of their Personal Information, and the stress, nuisance, and aggravation of dealing with all issues resulting from the Data Breach.

8.     Plaintiff and Class members suffered a loss of the property value of their Private Information when it was acquired by cyber thieves in the Data Breach.  Numerous courts have recognized the loss of property value of highly sensitive personal information in data breach cases as cognizable damages.

9.     There has been no assurance offered from CHS that all personal data or copies of data have been recovered or destroyed.  CHS offered 24 months of Equifax identity protection monitoring through Equifax, which does not guarantee the security of Plaintiff's compromised Private Information.  To mitigate further harm, Plaintiff chose not to disclose any information to receive these credit monitoring services connected with CHS.

3

10.     Accordingly, Plaintiff asserts claims for negligence, breach of contract, breach of implied contract, and breach of fiduciary duty, as well as a claim for declaratory relief.

## PARTIES, JURISDICTION, AND VENUE

### A.     Plaintiff Ashley Salas

11.     Plaintiff Ashley Salas is a citizen of California and brings this action in her individual capacity and on behalf of all others similarly situated.  Ms. Salas has resided in Fresno County in the state of California for her entire life and intends to remain in California indefinitely.

12.     Ms. Salas used CHS's services when she applied for a job within the US Department of Homeland Security at the US Customs and Border Patrol Agency between late 2018 and early 2019 and more recently in September of 2021 when she applied for a job at the Transportation Security Administration. Defendant CHS administered medical examinations through a clinic in California as part of the application and employment screening process during Ms. Sala's candidacy for each of these positions. To receive services at CHS, Plaintiff Salas was required to disclose her Private Information, which was then entered into CHS's database and maintained by Defendant.  In maintaining her Private Information, Defendant expressly and impliedly promised to safeguard Plaintiff Salas's Private Information.  Defendant, however, did not take proper care of Ms.

Salas's Private Information, leading to its exposure to and acquisition by cybercriminals as a direct result of Defendant's inadequate security measures. In February of 2022, Plaintiff Salas received a notification letter from Defendant stating that her sensitive Private Information was taken.

13.     The letter also offered 24 months of identity theft monitoring through Equifax, which was and continues to be ineffective for Salas and other Class members. The Equifax credit monitoring would have shared Ms. Salas's information with additional third parties connected to Defendant and could not guarantee complete privacy of her sensitive Private Information.

14.     In the months and years following the Data Breach, Ms. Salas and the other Class members will experience a slew of harms as a result of Defendant's ineffective data security measures. Some of these harms will include fraudulent charges, medical procedures ordered in patients' names without their permission, and targeted advertising without patient consent.

15.     Some of these injuries have already materialized in Plaintiff's case. On February 28, 2022, Ms. Salas received an alert through McAfee, her identity theft protection software, that her email address had been used in a potential identity theft attempt. As will be described below, hackers can piece together information acquired from a much wider scope than was previously possible,

creating a comprehensive profile of an individual to be used in creative identity theft attacks.

16.     Plaintiff Salas greatly values her privacy, especially in receiving medical services, and would not have paid the amount that she did for her physical examination services if she had known that her information would be maintained using inadequate data security systems.

**B.     Defendant Comprehensive Health Services**

17.     Defendant Comprehensive Health Services, LLC is a Delaware limited liability company with its principal place of business located in the State of Florida at 8600 Astronaut Boulevard, Cape Canaveral, Florida 32920.  CHS conducts business nationally, including in the state of California.  CHS offers a number of medical management solutions, including occupational health services for the US Department of Homeland Security.  CHS's corporate policies and practices, including those used for data privacy, are established in, and emanate from, Florida.

**C.     Jurisdiction**

18.     The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) ("CAFA"), because (a) there are 100 or more class members, (b) at least one class member is a citizen of a state that is diverse from Defendant's

6

citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

19.     The Court has personal jurisdiction over Defendant because Defendant is a Delaware limited liability company.

20.     The Court also has personal jurisdiction over Defendant because it solicits customers and transacts business in Delaware and throughout the United States.

**D.     Venue**

21.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant resides within this District.

22.     Plaintiff is informed and believes, and thereon alleges, that each and every one of the acts and omissions alleged herein were performed by, and/or attributable to, Defendant.

## FACTS

23.     Defendant provides a number of medical management solutions, including occupational health services, for the US Department of Homeland Security across the country. As part of its business, Defendant was entrusted with, and obligated to safeguard and protect the Private Information of, Plaintiff and the Class in accordance with all applicable laws.

24.     In September of 2020, Defendant first learned of an unauthorized entry into its network, which contained individuals' Private Information including names, dates of birth, and Social Security numbers, collectively known as Personally Identifiable Information.[1]

25.     Upon learning of the Data Breach in September 2020, Defendant investigated.  As a result of the Data Breach, Defendant initially estimated that the Private Information of at least 106,752 patients stemming from services previously received was potentially compromised.[2]

26.     In February of 2022 Defendant announced that it first learned of suspicious activity that allowed one or more cybercriminals to access their systems through a cyberattack (the "Notice").  The Notice disclosed the following information, including that a threat actor had accessed CHS systems:

> Cape Canaveral, FL: 02/11/2022 – Comprehensive Health Services ("CHS") has learned of a data security incident that may have involved personal and / or protected health information belonging to a limited number of individuals. CHS has sent notification letters to potentially involved individuals with identifiable address information to notify them about this incident and provide resources to assist them.

---

[1] *Comprehensive Health Services Provides Notification of Data Security Incident* (Feb. 11, 2022), https://www.chsmedical.com/security-notice.html [hereinafter *Data Breach Notice*].

[2] These numbers were reported to the Health and Human Services Healthcare Data Breach Portal. *See Cases Currently Under Investigation*, U.S. DEP'T OF HEALTH & HUMAN SERVS.: BREACH PORTAL, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf [hereinafter *Breach Portal*] (last visited Mar. 3, 2021).

On September 30, 2020, CHS detected unusual activity within its digital environment following discovery of fraudulent wire transfers. In response, CHS took immediate steps to secure its digital environment and promptly launched an investigation. In so doing, CHS engaged independent digital forensics and incident response experts to determine what happened and to identify any information that may have been accessed or acquired without authorization as a result. On November 3, 2021, CHS learned that certain personal information may have been impacted in connection with the incident. CHS then worked diligently to identify address information required to effectuate notification.

There is no evidence of the misuse of any information potentially involved in this incident. However, on January 20, 2022, and 02/11/2022, CHS sent notification letters to the individuals whose personal / protected health information was potentially involved in this incident for whom CHS had identifiable address information providing them information about what happened and steps they can take to protect their personal and / or protected health information.

Based on the investigation of the incident, the following personal and / or protected health information may have been involved in the incident: name, date of birth, and / or Social Security number.

CHS takes the security of all information within its possession very seriously and is taking steps to prevent a similar event from occurring in the future, including investing in enhanced security measures.

CHS has established a toll-free call center to answer questions about the incident and related concerns. The call center is available Monday through Friday from 8:00 A.M. to 8:00 P.M. Central Time, Monday through Friday (excluding holidays) and can be reached at 1-800-741-0381.

> The privacy and protection of personal and protected health information is a top priority for CHS, which deeply regrets any inconvenience or concern this incident may cause.

27.    Defendant offered no explanation in the Notice or elsewhere for the delay between the initial discovery of the Breach and the belated notification to affected patients—totaling over a year and a half—which resulted in Plaintiff and Class members suffering harm they otherwise could have avoided had a timely disclosure been made.

28.    CHS's notice of Data Breach was not just untimely but woefully deficient, failing to provide basic details, including but not limited to, how unauthorized parties accessed its networks, what information was accessed, whether the information was encrypted or otherwise protected, how it learned of the Data Breach, whether the breach occurred system-wide, whether servers storing information were accessed, and how many patients were affected by the Data Breach.  Even worse, CHS offered only two years of identity theft monitoring to Plaintiff and Class members, which required the disclosure of additional Private Information that CHS had just demonstrated it could not be trusted with.

29.    Plaintiff's and Class members' Private Information is for sale to criminals on the dark web, meaning that unauthorized parties have accessed and viewed Plaintiff's and Class members' unencrypted, unredacted information,

including names, addresses, email addresses, dates of birth, Social Security

numbers, member ID numbers, policyholder names, employer names, policy

numbers name, and more, with the intent of selling it and/or using it fraudulently to

profit from such use.

30.     The Breach occurred because Defendant failed to take reasonable

measures to protect the Private Information it collected and stored. Among other

things, Defendant failed to implement adequate data security measures designed to

prevent this attack, despite repeated warnings to the healthcare industry, insurance

companies, and associated entities about the risk of cyberattacks and the highly

publicized occurrence of many similar attacks in the recent past on other healthcare

providers.

31.     Defendant disregarded the rights of Plaintiff and Class members by

intentionally, willfully, recklessly, or negligently failing to take and implement

adequate and reasonable measures to ensure that Plaintiff's and Class members'

Private Information was safeguarded, failing to take available steps to prevent an

unauthorized disclosure of data, and failing to follow applicable, required and

appropriate protocols, policies and procedures regarding the encryption of data,

even for internal use. As a result, the Private Information of Plaintiff and Class

members was compromised through unauthorized access by an unknown third-

party cybercriminal seeking to profit from the theft and misuse of such Private

Information. Plaintiff and Class members have a continuing interest in ensuring that their Private Information is and remains safe.

## A.    Defendant's Privacy Promises

32.    CHS made, and continues to make, various promises to its patients, including Plaintiff, that it will maintain the security and privacy of their Private Information.

33.    In a May 2020 overview presentation, Defendant's parent company, Caliburn International (now known as Acuity International) stated the following:

> "We offer differentiated services through our proprietary and HIPAA-compliant IT systems, mobile medical services, physician review expertise, and comprehensive national provider network to differentiated services."

A true and correct screenshot of that presentation slide is included below:



34.     None of CHS's use of patient information provide it a right to expose patients' Private Information in the manner it was exposed to unauthorized third parties in the Data Breach.

35.     By allowing the Data Breach to occur and thus failing to protect Plaintiff and Class members' Private Information, CHS broke these promises to Plaintiff and Class members.

**B.      Defendant Failed to Maintain Reasonable and Adequate Data Security Measures to Safeguard Patients' Private Information**

36.     In the course of providing its employment-based medical examinations, CHS acquires, collects, and stores a massive amount of patients'

protected Private Information, including health information and other personally identifiable data.

37.     As a condition of engaging in health-related services, CHS requires that these patients entrust them with highly confidential Private Information.

38.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Private Information, CHS assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' Private Information from disclosure.

39.     Defendant had obligations created by the Health Insurance Portability Act (42 U.S.C. § 1320d *et seq.*) ("HIPAA"), industry standards, common law, and representations made to Class members, to keep Class members' Private Information confidential and to protect it from unauthorized access and disclosure.

40.     Defendant failed to properly safeguard Class members' Private Information, allowing hackers to access and acquire it for their own gain.

41.     Plaintiff and Class members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant and any of its affiliates would comply with their obligation to keep such information confidential and secure from unauthorized access.

42.     Prior to and during the Data Breach, Defendant promised patients that their Private Information would be kept confidential.

14

43.    Defendant's failure to provide adequate security measures to safeguard patients' Private Information is especially egregious because Defendant operates in a field which has recently been a frequent target of scammers attempting to fraudulently gain access to patients' highly confidential Private Information.

44.    In fact, Defendant has been on notice for years that the healthcare industry and health insurance companies are a prime target for scammers because of the amount of confidential patient information maintained.

45.    Defendant was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[3]

46.    The American Medical Association ("AMA") has also warned healthcare companies about the important of protecting their patients' confidential information:

---

[3] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warnshealthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[4]

47.     The number of US data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[5]  In 2017, a new record high of 1,579 breaches were reported—representing a 44.7 percent increase.[6]  That trend continues.

48.     The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[7] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs

---

[4] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N        (Oct.        4,        2019),        https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

[5] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity   Theft   Resource   Center   and   CyberScout* (Jan.   19,   2017), https://www.idtheftcenter.org/surveys-studys.

[6] Identity   Theft   Resource   Center, *2017   Annual   Data   Breach   Year-End   Review*, https://www.idtheftcenter.org/2017-data-breaches/.

[7] Identity   Theft   Resource   Center, *2018   End  -of-Year   Data   Breach   Report*, https://www.idtheftcenter.org/2018-data-breaches/.

for healthcare they did not receive in order to restore coverage.[8] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[9]

49.    A 2017 study conducted by HIMSS Analytics showed that email was the most likely cause of a data breach, with 78 percent of providers stating that they experienced a healthcare ransomware or malware attack in the past 12 months.

50.    The number of healthcare related data breaches continued to increase in 2020 when CHS was breached.[10]

51.    In the Healthcare industry, the number one threat vector from a cyber security standpoint is phishing. Cybersecurity firm Proofpoint reports that "phishing is the initial point of compromise in most significant [healthcare] security incidents, according to a recent report from the Healthcare Information and Management Systems Society (HIMSS). And yet, 18% of healthcare

---

[8] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for- victims/.
[9] *Id.*
[10] *2019 HIMSS Cybersecurity Survey*, https://www.himss.org/2019-himsscybersecurity-survey.

organizations fail to conduct phishing tests, a finding HIMSS describes as "incredible."[11]

52.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precaution for protection."[12]

53.    To prevent and detect ransomware attacks, including a ransomware attack that could have caused the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

---

[11] Aaron Jensen, *Healthcare Phishing Statistics: 2019 HIMSS Survey Results*, PROOFPOINT (Mar. 27, 2019), https://www.proofpoint.com/us/security-awareness/post/healthcare-phishingstatistics-2019-himss-survey-results.
[12] *See How to Protect Your Networks from RANSOMWARE*, FBI (2016) https ://www. fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege; no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

54.     To prevent and detect ransomware attacks, including a ransomware attack that could have resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks . . .

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself.  Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . .

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it . . .

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters— and keep them updated—to reduce malicious network traffic . . .[13]

55.    To prevent and detect ransomware attacks, including a ransomware attack that could have resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
  - Apply the latest security updates

---

[13] *See Security Tip (ST19-001) Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (Apr. 11, 2019), https://us-cert.cisa.gov/ncas/tips/ST19-001.

- Use threat and vulnerability management
- Perform regular audit; remove privilege credentials;
- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**
  - use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**
  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[14]

---

[14] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-apreventable-disaster/.

56.     These are basic, common-sense email security measures that every business, not only healthcare businesses that contract with the US government, should be doing.  CHS, with its heightened standard of care should be doing even more.  But by adequately taking these common-sense solutions, CHS could have prevented this Data Breach from occurring.

57.     Charged with handling sensitive Private Information, including health information, CHS knew, or should have known, the importance of safeguarding its patients' Private Information that was entrusted to it and of the foreseeable consequences if its data security systems were breached.  This includes the significant costs that would be imposed on CHS patients as a result of a breach.  CHS failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

58.     Upon information and belief, with regard to training, CHS specifically failed to:

- Implement a variety of anti-ransomware training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;
- Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and
- Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

59.     The Private Information was also maintained on CHS's computer system in a condition vulnerable to cyberattacks such as through the infiltration of Defendant's systems through ransomware attacks.  The mechanism of the cyberattack and the potential for improper disclosure of Plaintiff and Class members' Private Information was a known risk to CHS, and thus CHS was on notice that failing to take reasonable steps necessary to secure the Private Information from those risks left the Private Information in a vulnerable position.

## C.     The Monetary Value of Privacy Protections and Private Information

60.     The fact that Plaintiff's and Class members' Private Information was stolen—and is likely presently offered for sale to cyber criminals—demonstrates the monetary value of the Private Information.

61.     At all relevant times, Defendant was well aware that Private Information it collects from Plaintiff and Class members is highly sensitive and of significant value to those who would use it for wrongful purposes.

62.     Private Information is a valuable commodity to identity thieves.  As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[15]  Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private

---

[15]   Federal Trade Commission, *Warning Signs of Identity Theft* (Sept. 2018), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft .

Information including sensitive health information on multiple underground

Internet websites, commonly referred to as the dark web.

63.    At an FTC public workshop in 2001, then-Commissioner Orson

Swindle described the value of a consumer's personal information:

> The use of third party information from public records,
> information aggregators and even competitors for
> marketing has become a major facilitator of our retail
> economy. Even [Federal Reserve] Chairman [Alan]
> Greenspan suggested here some time ago that it's
> something on the order of the life blood, the free flow of
> information.[16]

64.    Commissioner Swindle's 2001 remarks are even more relevant today,

as consumers' personal data functions as a "new form of currency" that supports a

$26 Billion per year online advertising industry in the United States.[17]

65.    The FTC has also recognized that consumer data is a new (and

valuable) form of currency.  In an FTC roundtable presentation, another former

Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types
> and amount of information collected by businesses, or why
> their information may be commercially valuable. Data is

---

[16] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[17] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529 [hereinafter *Web's New Hot Commodity*].

currency.  The larger the data set, the greater potential for analysis—and profit.[18]

66.     Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[19]  The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information.  And, by making the transaction transparent, consumers will make a profit from their Private Information.  This business has created a new market for the sale and purchase of this valuable data.

67.     Consumers place a high value not only on their Private Information, but also on the privacy of that data.  Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable.  Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[20]

68.     The value of Plaintiff's and Class members' Private Information on the black market is substantial. Sensitive health information can sell for as much as

---

[18] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_ statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.
[19] *Web's Hot New Commodity*, *supra* note 17.
[20] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

$363.[21] This information is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

69.     Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[22]

70.     The ramifications of CHS's failure to keep its patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

---

[21]Center for Internet Security, *Data Breaches: In the Healthcare Sector*, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/.

[22] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft/.

27

71.     Approximately 21% of victims do not realize their identify has been
compromised until more than two years after it has happened.[23] This gives thieves
ample time to seek multiple treatments under the victim's name. Forty percent of
consumers found out they were a victim of medical identity theft only when they
received collection letters from creditors for expenses that were incurred in their
names.[24]

72.     Breaches are particularly serious in healthcare industries. The
healthcare sector reported the second largest number of breaches among all
measured sectors in 2018, with the highest rate of exposure per breach.[25] Indeed,
when compromised, healthcare related data is among the most private and
personally consequential. A report focusing on healthcare breaches found that the
"average total cost to resolve an identity theft-related incident . . . came to about
$20,000," and that the victims were often forced to pay out-of-pocket costs for
healthcare they did not receive in order to restore coverage.[26] Almost 50% of the

---

[23] *See Medical ID Theft Checklist*, IDENTITYFORCE https://www.identityforce.com/blog/medical-id-theft-checklist-2.
[24] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, EXPERIAN, (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.
[25] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report*, (2019) https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[26] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for- victims/.

surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[27]

73.     At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.  Defendant should have particularly been aware of these risks given the significant number of data breaches affecting the medical industry and related industries.

74.     Had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented the ransomware attack into its systems and, ultimately, the theft of its patients' Private Information.

75.     The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical

---

[27] *Id.*

association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[28] For example, different elements of personally identifiable information and/or protected health information from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[29] Based upon information and belief, the unauthorized parties utilized the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class members that was misused.

76.     In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

77.     Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment

---

[28] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework.

[29] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

card information was not involved in the Data Breach, the unauthorized parties

could use Plaintiff's and Class members' Private Information to access accounts,

including, but not limited to email accounts and financial accounts, to engage in

the fraudulent activity identified by Plaintiff.

78.     Given these facts, any company that transacts business with customers

and then compromises the privacy of Private Information entrusted to it by way of

such business relationships has thus deprived both the customers and the impacted

patients of the full monetary value of the transactions between them.

79.     In short, the Private Information exposed is of great value to hackers

and cyber criminals and the data compromised in the Data Breach will be used in a

variety of unlawful manners, including opening new credit and financial accounts

in users' names.

**D.     CHS's Conduct violated HIPAA**

80.     HIPAA requires covered entities like CHS protect against reasonably

anticipated threats to the security of PHI. Covered entities must implement

safeguards to ensure the confidentiality, integrity, and availability of PHI.

Safeguards must include physical, technical, and administrative components.[30]

---

[30] *What is Considered Protected Health Information Under HIPAA?*, HIPPA JOURNAL, https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/.

81.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, et seq. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

82.     The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[31]

83.     Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations. CHS's security failures include, but are not limited to, the following:

- Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

- Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have

---

[31]*Breach Notification Rule*, U.S. DEP'T HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html.

been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

- Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

- Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

- Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

- Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

- Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

- Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

- Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health

information in violation of 45 C.F.R. §164.530(b) and
45 C.F.R. §164.308(a)(5); and

- Failing to design, implement, and enforce policies and
  procedures establishing physical and administrative
  safeguards to reasonably safeguard protected health
  information, in compliance with 45 C.F.R.
  §164.530(c).

84.     The FTC has promulgated numerous guides for businesses that
highlight the importance of implementing reasonable data security practices.
According to the FTC, the need for data security should be factored into all
business decision-making.[32]

85.     In 2016, the FTC updated its publication, Protecting Personal
Information: A Guide for Business, which established cybersecurity guidelines for
businesses.[33] The guidelines note that businesses should protect the personal
information that they keep; properly dispose of personal information that is no
longer needed; encrypt information stored on computer networks; understand their
network's vulnerabilities; and implement policies to correct any security problems.

86.     The FTC further recommends that companies not maintain Private
Information longer than is needed for authorization of a transaction; limit access to

---

[32] *Start With Security: A Guide for Business*, FED. TRADE. COMM'N (June 2015),
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf
[hereinafter *Start with Security*].
[33] *Protecting Personal Information: A Guide for Business*, FED. TRADE. COMM'M (Oct. 2016),
https://www.ftc.gov/system/files/documents/plain-language/pdf-      0136_proteting-personal-
information.pdf.

private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[34]

87.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

88.     CHS was at all times fully aware of its obligation to protect the Private Information of patients because of its position as a trusted healthcare provider.  CHS was also aware of the significant repercussions that would result from its failure to do so.

**E.     CHS Failed to Comply with Healthcare Industry Standards**

89.     HHS's Office for Civil Rights has stated:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry.

---

[34] *Start with Security*, *supra* note 32.

> Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.[35]

90.     HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of Private Information; (b) educating and training healthcare employees on how to protect Private Information; and (c) correcting the configuration of software and network devices.

91.     Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyber-attacks, both because the of value of the Private Information which they maintain and because as an industry they have been slow to adapt and respond to cybersecurity threats.[36] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of Private Information.

92.     Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, CHS chose to ignore them. These best practices were known, or should have been known by CHS, whose

---

[35] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.
[36] *See, e.g., 10 Best Practices For Healthcare Security*, INFOSEC, https://resources.infosecinstitute.com/topics/healthcare-information-security/#gref.

failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Private Information.

**F.      Damages to Plaintiff and the Class**

93.     Plaintiff and the Class have been damaged by the compromise of their Private Information in the Data Breach.

94.     The ramifications of CHS's failure to keep patients' Private Information secure are long lasting and severe.  Once Private Information is stolen, fraudulent use of that information and damage to the victims may continue for years.  Consumer victims of data breaches are more likely to become victims of identity fraud.[37]

95.     In addition to their obligations under state laws and regulations, Defendant owed a common law duty to Plaintiff and Class members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

96.     Defendant further owed and breached its duty to Plaintiff and Class members to implement processes and specifications that would detect a breach of

---

[37] *2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

97.     As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiff's and Class members' Private Information as detailed above, and Plaintiff is now at a heightened and increased risk of identity theft and fraud.

98.     The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or denied loans for education, housing, or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

99.     Some of the risks associated with the loss of personal information have already manifested themselves in Plaintiff's case.  Ms. Salas received a cryptically written notice letter from Defendant stating that her information was released, and that she should remain vigilant of fraudulent activity on her accounts,

with no other explanation of where this information could have gone, or who might have access to it.

100.   Plaintiff and the Class have suffered or face a substantial risk of suffering out-of-pocket fraud losses such as fraudulent charges on online accounts, credit card fraud, loans opened in their names, medical services billed in their name, and similar identity theft.

101.   Plaintiff and Class members have, may have, and/or will have incurred out of pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

102.   Plaintiff and Class members did not receive the full benefit of the bargain, and instead received services that were of a diminished value to that described in their agreements with CHS. They were damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and the services they received.

103.   Plaintiff and Class members would not have obtained services from Defendant had Defendant told them that it failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from theft.

104.    Plaintiff and the Class will continue to spend significant amounts of time to monitor their financial and medical accounts for misuse.

105.    The theft of Social Security Numbers, which were purloined as part of the Data Breach, is particularly detrimental to victims.  The U.S. Social Security Administration ("SSA") warns that "[i]dentity theft is one of the fastest growing crimes in America."[38]  The SSA has stated that "[i]dentity thieves can use your number and your good credit to apply for more credit in your name.  Then, they use the credit cards and don't pay the bills, it damages your credit.  You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought."[39]  In short, "[s]omeone illegally using your Social Security number and assuming your identity can cause a lot of problems."[40]

106.    In fact, a new Social Security number is substantially less effective where "other personal information, such as [the victim's] name and address, remains the same" and for some victims, "a new number actually creates new problems.  If the old credit information is not associated with your new number,

---

[38] *Identity Theft And Your Social Security Number*, SOCIAL SECURITY ADMIN. (Dec. 2013), http://www.ssa.gov/pubs/EN-05-10064.pdf.
[39] *Id.*
[40] *Id.*

the absence of any credit history under your new number may make it more difficult for you to get credit."[41]

107.   Identity thieves can use the victim's Private Information to commit any number of frauds, such as obtaining a job, procuring housing, or even giving false information to police during an arrest.  In the healthcare industry context, Private Information can be used to submit false insurance claims. As a result, Plaintiff and Class members now face a real and continuing immediate risk of identity theft and other problems associated with the disclosure of their Social Security numbers, and will need to monitor their credit for an indefinite duration. For Plaintiff and Class members, this risk creates unending feelings of fear and annoyance. Private Information is especially valuable to identity thieves. Defendant knew or should have known this and strengthened its data systems accordingly.  Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

108.   As a result of the Data Breach, Plaintiff and Class members' Private Information has diminished in value.

109.   The Private Information belonging to Plaintiff and Class members is private, private in nature, and was left inadequately protected by Defendant who did not obtain Plaintiff or Class members' consent to disclose such Private

---

[41] *Id.*

Information to any other person as required by applicable law and industry standards. Defendant disclosed information about Plaintiff and the class that was of an extremely personal, sensitive nature as a direct result of its inadequate security measures.

110. The Data Breach was a direct and proximate result of Defendant's failure to (a) properly safeguard and protect Plaintiff's and Class members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

111. Defendant had the resources necessary to prevent the Data Breach, but neglected to implement adequate data security measures, despite its obligation to protect the highly sensitive Private Information it took possession and control over as part of its operations.

112. Defendant did not properly train their employees to identify and avoid ransomware attacks.

113. Had Defendant remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they

42

would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiff's and Class members' Private Information.

114.   As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

115.   The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[42]

116.   Other than offering 24 months of credit monitoring, Defendant did not take any measures to assist Plaintiff and Class members, other than some potential ways that Plaintiff may utilize to check her own accounts for fraud.  None of these recommendations, however, require Defendant to expend any effort to protect Plaintiff's and Class members' Private Information.

---

[42] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

117. Defendant's failure to adequately protect Plaintiff's and Class members' Private Information has resulted in Plaintiff and Class members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money–while Defendant sits by and does nothing to assist those affected by the incident. Instead, as CHS's Data Breach Notice indicates, it is putting the burden on Plaintiff and Class members to discover possible fraudulent activity and identity theft.

118. While Defendant offered some complimentary credit monitoring, Plaintiff could not trust a company that had already breached her data. The credit monitoring offered from Equifax does not guarantee privacy or data security for Plaintiff who would have to expose her information once more to get monitoring services. Thus, to mitigate harm, Plaintiff and Class members are now burdened with indefinite monitoring and vigilance of their accounts.

119. Moreover, the offer of 24 months of identity monitoring to Plaintiff and Class members is woefully inadequate. While some harm has begun already, the worst may be yet to come. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is acquired and when it is used. Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (i.e., fraudulent acquisition and use of another person's Private Information) – it does not prevent

44

identity theft.[43] This is especially true for many kinds of medical identity theft, for which most credit monitoring plans provide little or no monitoring or protection.

120.   Plaintiff and Class members have been damaged in several other ways as well.  Plaintiff and Class members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Private Information. Plaintiff and Class members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming activity. Plaintiff and Class members have also purchased credit monitoring and other identity protection services, purchased credit reports, placed credit freezes and fraud alerts on their credit reports, and spent time investigating and disputing fraudulent or suspicious activity on their accounts. Plaintiff and Class members also suffered a loss of the inherent value of their Private Information.  Moreover, Plaintiff Salas received an alert through her identity theft monitoring service that her email address had recently been used in a potential identity theft incident. This is precisely the type of injury that other class members can and will experience through the loss of their personal information.

---

[43] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, CNBC (Nov. 30, 2017), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-beworth-the-cost.html.

121.   The Private Information stolen in the Data Breach can be misused on its own, or can be combined with personal information from other sources such as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Private Information to send spear-phishing emails to Class members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

122.   As a result of Defendant's failures to prevent the Data Breach, Plaintiff and Class members have suffered, will suffer, and are at increased risk of suffering:

- The compromise, publication, theft and/or unauthorized use of their Private Information;

- Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

- Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

46

- The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the Private Information in its possession;

- Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class members; and

- Anxiety and distress resulting fear of misuse of their Private Information.

123.   In addition to a remedy for the economic harm, Plaintiff and Class members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

## CLASS ACTION ALLEGATIONS

124.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 and seeks certification of the following Nationwide Class and California Subclass (collectively defined herein as the "Class"), subject to amendment based on information obtained through discovery:

### Nationwide Class

All persons whose Private Information was compromised as a result of the Data Breach discovered on or about September of 2020 and who were sent notice of the Data Breach.

### California Subclass

> All persons residing in California whose Private
> Information was compromised as a result of the Data
> Breach discovered on or about September of 2020 and
> who were sent notice of the Data Breach.

Excluded from the Class are Defendant and Defendant's affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

125. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

126. **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that joinder of all Class members would be impracticable. On information and belief, the Nationwide Class numbers in the thousands.

127. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, *inter alia*:

- Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

48

- Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

- Whether Defendant properly implemented its purported security measures to protect Plaintiff's and the Class's Private Information from unauthorized capture, dissemination, and misuse;

- Whether Defendant took reasonable measures to determine the extent of the Data Breach after it first learned of same;

- Whether Defendant disclosed Plaintiff's and the Class's Private Information in violation of the understanding that the Private Information was being disclosed in confidence and should be maintained;

- Whether Defendant willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff's and the Class's Private Information;

- Whether Defendant was negligent in failing to properly secure and protect Plaintiff's and the Class's Private Information;

- Whether Defendant was unjustly enriched by its actions; and

- Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

128.   Defendant engaged in a common course of conduct giving rise to the

legal rights sought to be enforced by Plaintiff, on behalf of herself and other

members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

129. **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all Class members were similarly injured through Defendant's uniform misconduct described above and were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendant that are unique to Plaintiff.

130. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Nationwide Class because her interests do not conflict with the interests of the Class she seeks to represent, she has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and her counsel.

131. **Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

132.   **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct.  Even if members of the Class could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

133.   Class certification is also appropriate because this Court can designate particular claims or issues and designate multiple subclasses, if necessary, for class-wide treatment pursuant to Fed. R. Civ. P. 23(c)(4).

134.   No unusual difficulties are likely to be encountered in the management of this action as a class action.

## COUNT I
### Negligence
### (On Behalf of Plaintiff and the Nationwide Class)

135.   Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as though fully set forth herein.

136.   Upon Defendant's accepting and storing the Private Information of Plaintiff and the Class in their computer systems and on their networks, Defendant undertook and owed a duty to Plaintiff and the Class to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so.  Defendant knew that the Private Information was private and confidential and should be protected as private and confidential.

137.   Defendant owed a duty of care not to subject Plaintiff's and the Class's Private Information to an unreasonable risk of exposure and theft because Plaintiff and the Class were foreseeable and probable victims of any inadequate security practices.

138.   Defendant owed numerous duties to Plaintiff and the Class, including the following:

- to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in their possession;

- to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

- to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

139.    Defendant breached its duty to Plaintiff and Class members to adequately protect and safeguard Private Information by disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Private Information.  Furthering their dilatory practices, Defendant failed to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a malicious third party to gather Plaintiff's and Class members' Private Information and potentially misuse the Private Information and intentionally disclose it to others without consent.

140.    Defendant knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security. Defendant knew or should have known about numerous well-publicized data breaches within the medical industry.

141.    Defendant knew, or should have known, that their data systems and networks did not adequately safeguard Plaintiff's and Class members' Private Information.

142.   Defendant breached its duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class members' Private Information.

143.   Because Defendant knew that a breach of their systems would damage tens of thousands of patients, including Plaintiff and Class members, Defendant had a duty to adequately protect its data systems and the Private Information contained thereon.

144.   Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class members, which is recognized by laws and regulations including but not limited to common law.  Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

145.   In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

146.   Defendant also had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare

54

information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

147.   Defendant's violations of its duties owed under the FTC Act and HIPAA are further evidence of its negligence.

148.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant are bound by industry standards to protect confidential Private Information.

149.   Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their Private Information.  Defendant's misconduct included failing to: (1) secure Plaintiff's and Class member's Private Information; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

150.   Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class members' Private Information, and by

failing to provide timely notice of the Data Breach. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

- Failing to adequately monitor the security of Defendant's networks and systems;

- Allowing unauthorized access to Class members' Private Information;

- Failing to detect in a timely manner that Class members' Private Information had been compromised; and

  Failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages

151.   Through Defendant's acts and omissions described in this Complaint, including its failure to provide adequate security and failure to protect Plaintiff's and Class members' Private Information from being foreseeably captured, accessed, disseminated, stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiff's and Class members' Private Information during the time it was within Defendant's possession or control.

152.   Defendant's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to failing to adequately

protect the Private Information and failing to provide Plaintiff and Class members with timely notice that their sensitive Private Information had been compromised.

153.   Neither Plaintiff nor the other Class members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

154.   As a direct and proximate cause of Defendant's conduct, Plaintiff and Class members suffered damages as alleged above.

155.   Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide lifetime free credit monitoring to all Class members.

## COUNT II
### Breach of Contract
### (On Behalf of Plaintiff and the Nationwide Class)

156.   Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as though fully set forth herein.

157.   Plaintiff and other Class members entered into valid and enforceable express contracts with Defendant under which Plaintiff and other Class members agreed to provide their Private Information to Defendant, and Defendant agreed to

provide medical exam services and protect Plaintiff and Class members' Private Information.

158.   These contracts include HIPAA privacy notices and explanation of benefits documents.

159.   To the extent Defendant's specific obligation to protect Plaintiff's and other Class members' Private Information was not explicit in those express contracts, the express contracts included implied terms requiring Defendant to implement data security measures adequate to safeguard and protect the confidentiality of Plaintiff's and Class members' Private Information, including in accordance with HIPAA regulations, the FTC Act, federal, state and local laws, and industry standards. Plaintiff and Class members would not have entered into these contracts with Defendant without first understanding that their Private Information would be safeguarded and protected; stated otherwise, data security was an essential implied term of the parties' express contracts.

160.   A meeting of the minds occurred, as Plaintiff and other Class members agreed, among other things, to provide their Private Information in exchange for Defendant's agreement to protect the confidentiality of that Private Information.

161.   The protection of Plaintiff's and Class members' Private Information was a material aspect of Plaintiff's and Class members' contracts with Defendant.

162.   Defendant's promises and representations described above relating to HIPAA and industry practices, and about Defendant's purported concern about Plaintiff's and Class members' privacy rights became terms of the contracts between Defendant and Plaintiff and Class members. Defendant breached these promises by failing to comply with HIPAA and reasonable industry practices.

163.   Plaintiff and Class members read, reviewed, and/or relied on statements made by or provided by CHS in their express agreements with CHS and/or otherwise understood that CHS would protect their Private Information upon providing their Private Information to CHS.

164.   Plaintiff and Class members fully performed their obligations under their contracts with Defendant; however, Defendant did not.

165.   As a result of Defendant's breach of these terms, Plaintiff and other Class members have suffered a variety of damages including but not limited to: the lost value of their privacy; the lost benefit of their bargain with Defendant; the loss of the difference in the value of the secure health services Defendant promised and the insecure services received; the loss of the value of the time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, inter alia, the time and effort required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial and medical accounts, to closely review and monitor credit reports and

various accounts for unauthorized activity, and to file police reports; and the increased risk of future identity theft, fraud, and/or misuse of their Private Information, which may take years to manifest, discover, and detect.

166.   Plaintiff and Class members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and attorney fees, costs, and expenses.

## COUNT III
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Nationwide Class)

167.   Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as though fully set forth herein.

168.   Plaintiff brings this claim alternatively to her breach of contract claim.

169.   Through their course of conduct, Defendant, Plaintiff, and Class members entered into implied contracts for the provision of healthcare services, as well as implied contracts for the Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class members' Private Information.

170.   Specifically, Plaintiff entered into a valid and enforceable implied contract with Defendant when she first entered into the medical exam services agreement with Defendant.

171.   The valid and enforceable implied contracts to provide medical services that Plaintiff and Class members entered into with Defendant include Defendant's promise to protect nonpublic Private Information given to Defendant or that Defendant creates on its own from disclosure.

172.   When Plaintiff and Class members provided their Private Information to Defendant in exchange for Defendant's services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such Private Information.

173.   Defendant solicited and invited Class members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class members accepted Defendant's offers and provided their Private Information to Defendant.

174.   In entering into such implied contracts, Plaintiff and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, and were consistent with industry standards.

175.   Class members who entrusted their Private Information to Defendant reasonably believed and expected that Defendant would provide adequate data security to protect it. Defendant failed to do so.

176.   Under implied contracts, Defendant and/or its affiliated providers promised and were obligated to: (a) provide medical exam services to Plaintiff and Class members; and (b) protect Plaintiff's and the Class members' Private Information provided to obtain such benefits of such services. In exchange, Plaintiff and Members of the Class agreed to turn over their Private Information.

177.   Both the provision of medical exam services and the protection of Plaintiff's and Class members' Private Information were material aspects of these implied contracts.

178.   The implied contracts for the provision of medical exam services— contracts that include the contractual obligations to maintain the privacy of Plaintiff's and Class members' Private Information—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's Data Breach Notice.

179.   Defendant's express representations, including, but not limited to the express representations found in its handling of information covered by HIPAA, memorializes and embodies the implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff and protect the privacy of Plaintiff's and Class members' Private Information.

180.   Consumers of medical exam services value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with obtaining such services.  Plaintiff and Class members would not have entrusted their Private Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Information would be safeguarded and protected; nor would they have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

181.   A meeting of the minds occurred, as Plaintiff and Class members agreed and provided their Private Information to Defendant and/or its affiliated healthcare providers in exchange for, amongst other things, both the provision of healthcare services and the protection of their Private Information.

182.   Plaintiff and Class members performed their obligations under the contract when they provided their Private Information to Defendant.

183.   Defendant materially breached its contractual obligation to protect the highly sensitive and nonpublic Private Information Defendant gathered when the information was accessed and exfiltrated by cyber criminals through the Data Breach.

184.   Defendant materially breached the terms of the implied contracts, including, but not limited to, the terms stated in the relevant Notice of Privacy Practices. Defendant did not maintain the privacy of Plaintiff's and Class members' Private Information as evidenced by its notifications of the Data Breach to Plaintiff and Class members. Specifically, Defendant did not comply with industry standards, standards of conduct embodied in statutes like Section 5 of the FTCA, or otherwise protect Plaintiff's and Class members' Private Information as set forth above.

185.   The Data Breach was a reasonably foreseeable consequence of Defendant's action in breach of these contracts.

186.   As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class members did not receive full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in the contracts. Plaintiff and Class members therefore were damaged in an amount to be further determined at trial.

187.   Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, Class members, nor any other reasonable person would have provided their Private Information to Defendant and/or its affiliated providers.

64

188.   As a direct and proximate result of the Data Breach, Plaintiff and Class members have been harmed and suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, disruption of their medical care and treatment, out of pocket expenses, and the loss of the benefit of the bargain they struck with Defendant.

189.   Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

190.   Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

**COUNT IV**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Nationwide Class)**

191.   Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as though fully set forth herein.

192.   In providing their Private Information to Defendant, Plaintiff and Class members justifiably placed a special confidence in Defendant to act in good

faith and with due regard to interests of Plaintiff and Class members to safeguard and keep confidential that Private Information.

193.   Defendant accepted the special confidence Plaintiff and Class members placed in it, as evidenced by its assertion that it "takes the privacy and security of [Plaintiff's] information very seriously" as included in the Data Breach notification letter.

194.   In light of the special relationship between Defendant and Plaintiff and Class members, whereby Defendant became a guardian of Plaintiff's and Class members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of the patients, including Plaintiff and Class members, for the safeguarding of Plaintiff's and Class member's Private Information.

195.   Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of the relationship between them, in particular, to keep secure highly sensitive patient Private Information.

196.   Defendant breached its fiduciary duties to Plaintiff and Class members by failing to protect the integrity of the systems containing Plaintiff and Class member's Private Information.

197.   Defendant breached its fiduciary duties to Plaintiff and Class members by otherwise failing to safeguard Plaintiff's and Class members' Private Information.

198.   As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class members have suffered and/or will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and class members; and (vii) the diminished value of Defendant's services they received.

199.   As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

### COUNT V
### Violation of the California Constitution's Right to Privacy
### Cal. Const., art. I, § 1.
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the California Subclass)**

200.   Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as though fully set forth herein.

201.   The California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possession, and protecting property, and pursuing and obtaining safety, happiness, and privacy." (Cal. Const., art. I. § 1.)

202.   Plaintiff and the Class had a legally recognized and protected privacy interest in the personal and financial information provided to and obtained by Defendant, including but not limited to an interest in precluding the dissemination or misuse of this sensitive and confidential information and the misuse of this information for malicious purposes such as theft of funds.

203.   Plaintiff and the Class reasonably expected Defendant would prevent the unauthorized viewing, use, manipulation, exfiltration, theft, and disclosure of

their personal and financial information and the unauthorized use of their Private Information.

204.   Defendant's conduct described herein resulted in a serious invasion of privacy of Plaintiff and the Class, as the release of Private Information could highly offend a reasonable individual.

205.   As a direct consequence of the actions as identified above, Plaintiff and the Class suffered harms and losses including but not limited to economic loss, the loss of control over use of their identity, harm to their constitutional right to privacy, lost time dedicated to the investigation and attempt to cure harm to their privacy, the need for future expenses and time dedicated to the recovery and protection of further loss, and privacy injuries associated with having their sensitive personal and financial information disclosed.

## COUNT VI
## Violation of the California Confidentiality of Medical Information Act ("CMIA") Cal. Civ. Code § 56, *et seq.*
**(On Behalf of Plaintiff and Nationwide Class or, Alternatively, the California Subclass)**

206.   Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as though fully set forth herein.

207.   Defendant is a "provider of healthcare," as defined in Cal. Civ. Code § 56.06, and is therefore subject to the requirements of the CMIA, Cal. Civ. Code §§ 56.10(a), (d) and (e), 56.36(b), 56.101(a) and (b).

208.   Defendant is licensed under California under California's Business and Professions Code, Division 2. See Cal. Bus. Prof. Code § 4000, et seq. and therefore qualifies as a "provider of healthcare" under the CMIA.

209.   Plaintiff and Class members are "patients," as defined in CMIA, Cal. Civ. Code § 56.05(k) ("'Patient' means any natural person, whether or not still living, who received healthcare services from a provider of healthcare and to whom medical information pertains.").

210.   Defendant disclosed "medical information," as defined in CMIA, Cal. Civ. Code § 56.05(j), to unauthorized persons without first obtaining consent, in violation of Cal. Civ. Code § 56.10(a). The disclosure of information to unauthorized individuals in the Security Breach resulted from the inactions of Defendant, including its failure to adequately implement sufficient data security measures and protocols to protect Plaintiff's and Class members' Personal and Medical Information, which allowed hackers to obtain Plaintiff's and the Class members' medical information.

211.   Defendant's negligence resulted in the release of individually identifiable medical information pertaining to Plaintiff and the Class to unauthorized persons and the breach of the confidentiality of that information. Defendant's negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiff's and Class members' medical information in a manner that

preserved the confidentiality of the information contained therein, in violation of

Cal. Civ. Code §§ 56.06 and 56.101(a).

212.   Defendant's systems and protocols did not protect and preserve the

integrity of electronic medical information in violation of Cal. Civ. Code §

56.101(b)(1)(A).

213.   Plaintiff and the Class were injured and have suffered damages, as

described above, from Defendant's illegal disclosure and negligent release of their

medical information in violation of Cal. Civ. Code §§ 56.10 and 56.101, and

therefore seek relief under Civ. Code §§ 56.35 and 56.36, including actual

damages, nominal statutory damages of $1,000, punitive damages of $3,000,

injunctive relief, and attorney fees, expenses and costs.

**COUNT VII**
**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the**
**California Subclass)**

214.   Plaintiff incorporates by reference the allegations contained in each of

the preceding paragraphs as though fully set forth herein.

215.   Defendant violated California's Unfair Competition Law ("UCL")

Cal. Bus. Prof. Code § 17200, *et seq.*, by engaging in unlawful, unfair or fraudulent

business acts and practices and unfair, deceptive, untrue or misleading advertising

that constitute acts of "unfair competition" as defined in the UCL, including, but not limited to, the following:

- By representing and advertising that it would maintain adequate data privacy and security practices and procedures to safeguard Plaintiff's and Class member's Personal and Medical Information from unauthorized disclosure, release, data breach, and theft; representing and advertising that Defendant would and did comply with the requirement of relevant federal and state laws relating to privacy and security of Plaintiff's and Class's Private Information; and omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for the Private Information;

- By soliciting and collecting Private Information from Plaintiff's and Class members without adequately protecting or storing Private Information;

- By violating the privacy and security of HIPPA, 42 U.S.C. §1302d, et seq.; and

- by violating the CMIA, Cal. Civ. Code § 56, et seq.

216.   Defendant's practices were also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities that solicit or are entrusted with personal data utilize appropriate security measures, as

reflected by laws like the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1302d, et seq., and the CMIA, Cal. Civ. Code § 56, *et seq.*

217.   As a direct and proximate result of Defendant's unfair and unlawful practices and acts, Plaintiff and the Class were injured and lost money or property, including but not limited to the delayed healthcare treatment, overpayments Defendant received to maintain adequate security measures and did not, the loss of their legally protected interest in the confidentiality and privacy of their Personal and Medical Information, and additional losses described above.

218.   Defendant knew or should have known that its computer systems were vulnerable and thus inadequate to safeguard Plaintiff's and Class members' Private Information and that the risk of a data breach or theft was highly likely. Defendant should have prepared for how to continuously provide healthcare treatment in case of a Security Breach.  Defendant had resources to secure and/or prepare for protecting patient Private Information in a Security Breach. Defendant's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of the Class.

219.   Plaintiff seeks relief under the UCL, including restitution to the Class of money or property that the Defendant may have acquired by means of Defendant's deceptive, unlawful, and unfair business practices, declaratory relief,

attorney fees, costs and expenses (pursuant to Cal. Code Civ. P. § 1021.5), and injunctive or other equitable relief.

### COUNT VIII
### Declaratory Relief
### (On Behalf of Plaintiff and the Nationwide Class)

220.   Plaintiff incorporates by reference the allegations contained in each of the preceding paragraphs as though fully set forth herein.

221.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

222.   An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class members' Private Information, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that further compromises of their Private Information will occur in the future.

223.   The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect consumer and patient Private Information.

224.   Defendant still possesses the Private Information of Plaintiff and the Class.

225.   Defendant has made no announcement that it has changed its data storage or security practices relating to the Private Information.

226.   Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

227.   If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at CHS. The risk of another such breach is real, immediate, and substantial.

228.   The hardship to Plaintiff and Class members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at CHS, Plaintiff and Class members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

229.    Issuance of the requested injunction will not disserve the public

interest. To the contrary, such an injunction would benefit the public by preventing

another data breach at CHS, thus eliminating the additional injuries that would

result to Plaintiff and Class members, along with other patients whose Private

Information would be further compromised.

230.    Pursuant to its authority under the Declaratory Judgment Act, this

Court should enter a judgment declaring that CHS implement and maintain

reasonable security measures, including but not limited to the following:

- Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on CHS's systems on a periodic basis, and ordering CHS to promptly correct any problems or issues detected by such third-party security auditors;

- engaging third-party security auditors and internal personnel to run automated security monitoring;

- auditing, testing, and training its security personnel regarding any new or modified procedures;

- purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

- conducting regular database scans and security checks; and

- routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against Defendant, as follows:

A. For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class members' Private Information, and from failing to issue prompt, complete and accurate disclosures to Plaintiff and Class members;

C. For declaratory relief concluding that CHS owed, and continues to owe, a legal duty to employ reasonable data security to secure the Sensitive Information with which it is entrusted, specifically including information pertaining to healthcare and financial records it obtains from its clients, and to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

D. For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

E. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

F. Ordering Defendant to pay for not less than three (3) years of credit monitoring services for Plaintiff and the Class;

G. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

H. For an award of punitive damages, as allowable by law;

I. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

J. Pre- and post-judgment interest on any amounts awarded; and

K. Such other and further relief as this court may deem just and proper.

Dated: March 10, 2022          */s/ P. Bradford deLeeuw*
                               P. Bradford deLeeuw (#3569)
                               **DELEEUW LAW LLC**
                               1301 Walnut Green Road
                               Wilmington, DE 19807
                               (302) 274-2180
                               (302) 351-6905 (fax)
                               brad@deleeuwlaw.com

OF COUNSEL:

Nicholas A. Migliaccio
Jason S. Rathod
**MIGLIACCIO & RATHOD LLP**
412 H Street NE
Washington, DC 20002
Tel: (202) 470-3520
Email: nmigliaccio@classlawdc.com
Email: jrathod@classlawdc.com